E. EPSTEIN & CO. V. MEYER BROS. DRUG COMPANY ET AL.

No. 3360.

1. **Sale—Evidence Insufficient.**—See evidence held insufficient to prove an executed sale of a stock of liquors, no delivery or contract passing the property without delivery being shown.

2. **Same.**—The purchase at a sheriff sale and the payment of the price with intent that another should have a part thereof does not pass title to such other, although that to be taken by him was "all liquor in unbroken packages," and was stored in a separate room from the other stock purchased.

APPEAL from Kaufman. Tried below before Hon. ANSON RAINEY. The opinion states the case.

*Mathews & Neyland* and *Wm. H. Allen*, for appellants.—1. Appellants having agreed with John Clayton that said Clayton should attend the sale of the Orville Inabnit stock of goods, and if he could buy in said stock at 60 cents on the dollar, or less, they would take all the unbroken packages of liquors at the price paid by Clayton at such purchase; and Clayton having acted on such agreement, and purchased the goods at less than 60 cents on the dollar, the title to all the unbroken packages of liquors in said stock immediately passed to and vested in the appellants, and manual delivery was not necessary to complete the sale. Owens v. Clark, 78 Texas, 547; Cleveland v. Williams, 29 Texas, 204; Brewer v. Blanton, 66 Texas, 532; Davis v. Beason, 77 Texas, 604; Hatch v. Oil Co., 10 Otto, 124; Benj. on Sales, secs. 311, 677; Bish. on Con., sec. 1309; Nash v. Brewster, 39 Minn., 530.

2. The property converted by the defendants not being the property of the defendants in the writ under which the seizure was made, such seizure and conversion was a naked trespass and the writ was no justification. Holliman v. Carroll, 27 Texas, 23; Freem. on Ex., sec. 254.

3. Whatever equities may have existed between John Clayton and appellants, either as to the title or possession of the property, these could not shield the appellees from the consequences of their wrong, they not having pleaded such equities, nor having shown any connec-

tion therewith, but upon the contrary, having tendered by their special plea the sole issue that the property was subject to their levy. The interest of appellants was sufficient to authorize a recovery against a stranger, and the court erred in not rendering judgment in their favor against the appellees, who were strangers and trespassers. Shields v. Hunt, 45 Texas, 424; Wright v. Thompson, 14 Texas, 561, 562; Duncan v. Spear, 11 Wend., 54; 1 Chitty on Plead., sec. 152; Perkins v. Thornburgh, 10 Cal., 189; Lion v. Goree, 15 Ala., 360; Crosby v. Baker, 6 Allen, 295.

*McCormick & Spencer*, for appellees.—1. If one person purchases personal property and pays for it with his own money, and takes a bill of sale from the seller in his own name and takes possession, and it is agreed that the property shall belong to a third party when he repays the purchase money, the title to the property is vested in the person who furnishes the money and to whom the bill of sale was made. Johnson v. White, 46 Cal., 328; Brooks v. Fowle, 14 N. H., 248; Edwards v. Edwards, 39 Pa. St., 369; Coppage v. Barnett, 34 Mass., 621.

2. "No sale is complete so as to vest in the vendee an immediate right of property so long as anything remains to be done between the buyer and seller in relation to the goods. The goods sold must be separated and identified by marks and numbers, so as to be completely distinguished from all other goods, or from the bulk or mass with which they happen to be mixed." Allen v. Melton, 64 Texas, 218; Cleveland v. Williams, 29 Texas, 211; Owens v. Clark, 78 Texas, 547; Barnard v. Poor, 21 Pick., 378; Foster v. Ropes, 111 Mass., 10; Westfield v. Mayo, 122 Mass., 100.

COLLARD, JUDGE, *Section A.*—This suit was brought by the appellants, E. Epstein & Co., of Sherman, Texas, against W. L. Cabell, United States Marshal, and the sureties on his official bond, and against the Meyer Bros. Drug Company, for damages for alleged seizure and conversion of certain liquors of the value of $674.50. The goods were seized by Cabell as marshal by virtue of a writ of attachment sued out of the Federal Court at Dallas, Texas, at the suit of Meyer Bros. Drug Company against one O. Inabnit, of Terrell, Texas. E. Epstein & Co. allege that they were the owners of the goods when seized, and herein sue for their value. A general statement of the facts may now be given.

O. Inabnit was in the drug and liquor business in Terrell, when John Inabnit, the father of O. Inabnit, and others, constituting a bank, on the 26th of October, 1888, attached the entire stock of O. Inabnit, which by order of the court in chambers was sold and paid for by one John Clayton. Before the sale—according to the case as made by Epstein & Co.—Henry Hollander, one of the firm of Epstein & Co., made

an agreement with Clayton that the latter should attend the sale of the attached goods at Terrell, and if he could purchase the same at 60 cents on the dollar of the invoice price, or less, he should take the stock, except the unbroken packages of wines, whiskies, and brandies, which were to be taken by Epstein & Co. He also agreed to attend the sale of the Patterson goods attached, and to be sold at Greenville, Texas, Epstein & Co. to take off his hands the unbroken packages of liquors on the same terms, they being wholesale liquor dealers at Sherman, Texas. Clayton attended the sale at Terrell, and bought the Inabnit stock at 52 cents on the dollar of invoice price, aggregating $6500, the unbroken packages of liquor amounting to $2213, and paid for the same, and the money was paid into court to abide the result of the suit against Inabnit. Clayton listed the unbroken packages of liquors and sent a statement of them to Epstein & Co. He employed one Mattox to take charge of the stock at Terrell, to carry on the business in the same store formerly used by O. Inabnit, who was also employed as a clerk. Mattox was directed by Clayton to store all the unbroken packages of liquors in a room in the store formerly used as an office, separate from the other goods, and informed him that they belonged to Epstein & Co. This was done. Some of these whole packages were sold by Clayton's agent and billed to purchasers by Epstein & Co., but the purchase prices were paid to Clayton, and no money was paid to Epstein & Co., nor had they paid Clayton anything on the liquors, when in February, 1889, Clayton sold the stock of drugs to Dr. John Inabnit, who still retained O. Inabnit as clerk. Meyer Bros. Drug Company caused these unbroken packages of liquors to be attached, April 23, 1889, as the property of O. Inabnit, for debt, as before stated, indemnifying the marshal making the levy. Hence this suit by Epstein & Co. against the marshal and Meyer Bros. Drug Company.

The answer to the writ was, that the goods were not the property of Epstein & Co., but were the property of O. Inabnit at the time of the levy. It was also set up in the answer, that John Inabnit, father of O. Inabnit, with others, had the stock of O. Inabnit attached upon false and fictitious debts to shield the same from his foreign creditors; that the purchase of Clayton was pursuant to such fraudulent design, and was made by him for the benefit of O. Inabnit, from whom the title to the goods never passed; that the name of E. Epstein & Co. was used for the same fraudulent purpose, and that they had no other interest in the goods; that plaintiffs were wholesale liquor dealers, and that the goods were held and sold under cover of their name to evade the revenue laws.

The court gave judgment for defendant, upon the ground, as stated in his findings, that John Clayton was the owner and in possession of the goods when levied on, and that plaintiffs had no title or possession

and were not entitled to recover. Plaintiffs appeal, and assign this conclusion of the court both of fact and law as error.

We think the conclusion of the court is supported by the testimony, as what has been stated of the facts and some additions will show. Hollander, the member of the firm of Epstein & Co. who made the agreement with Clayton to buy the goods, testified that he saw Mattox, the agent of Clayton, in Greenville soon after the purchase; took him into a store and showed him how to make out a statement of the numbers and dates of the revenue stamps on the packages of liquors, and directed him to make out such a statement and send it to his firm; that he was afterward advised by Mattox that he could not make up the statement, because the stamps were defaced and mutilated. Then he (Hollander) concluded to go to Terrell himself and make out the list; that he was traveling salesman for his firm, and had not had an opportunity to go to Terrell before the goods were attached by Meyer Bros. Drug Company, and that he had been *waiting* to do this before he paid Clayton for the goods. Mattox corroborates this statement, and says he could not do as required, because of the defaced condition of the revenue stamps. Neither of these witnesses explain why the stamps had to be so listed. It may be inferred from this testimony that something remained to be done to identify the goods, or to complete the transaction. At all events, it tends to strengthen the conclusion of the court that Clayton was understood to be the real owner of the goods, even though some of the facts of the arrangement made might be sufficient to show a technical ownership in Epstein & Co. The goods were never moved from the drug store, but remained there in possession of Clayton and his agent about six months after the purchase, during which time a number of the whole packages were sold by them, though billed by Epstein & Co. at Sherman, the price being paid to Clayton. In one case a note was given Clayton for a barrel of whisky, and paid through the bank; in another, O. Inabnit let a case of liquors go to pay premium on his life policy, and the amount was charged to Clayton, to be deducted from the salary of Inabnit as clerk. In no case was any of the proceeds of sales sent to Epstein & Co., nor does it appear that they kept any account of such sales. E. Epstein, of the firm of Epstein & Co., testified, that he did not know anything about the arrangement between Clayton and Hollander; that no record was made on the books of the firm of Epstein & Co. of any goods at Terrell, Texas; that no record was made on the books of the sale of any goods at Terrell; that his firm owned no property in Kaufman County on January 1, 1889, and rendered none for taxes there; that his firm had never paid Clayton for any liquors, and had never received any money for any sales made of liquors from the Inabnit stock. He explains that he was away in Europe during the time these transactions were in progress and pending, and they were left in the hands

of his partner, Mr. Hollander; but the facts are as he states them in regard to the entries on the books and the nonpayment of money by either of the parties.

The facts that the goods were separated from the general stock, were sold as the goods of Epstein & Co., and that there was an agreement between Hollander and Clayton as stated, are sufficient of themselves, when taken alone, to put the title in Epstein & Co., notwithstanding there was no delivery (Owens v. Clark, 78 Texas, 547), and notwithstanding the mere fact that Epstein & Co. had never paid for them nor were to pay for them in the future. Brewer v. Blanton, 66 Texas, 532; Davis v. Beason, 77 Texas, 604. But there was evidence before the court to justify his conclusion, that it was not really the intention of the parties that Epstein & Co. were to be the owners of the liquors. The evidence warrants the inference that the name of Epstein & Co. was used by the consent of Hollander to protect Clayton in selling the goods at wholesale without procuring license therefor. That the parties may have been mistaken as to the law of such protection would be immaterial. But whatever may have been the motive, the deduction of the court is not without evidence to support it, that the semblance of ownership in Epstein & Co. was not real, but that in fact Clayton was the owner, and was so understood to be by himself and Hollander. Besides this, it seems Hollander thought there was something else to do to put the title in his firm by way of designation in description of the revenue stamps on the packages before the transaction was fully completed so as to pass the title. This may have been according to the terms of the agreement. We can not say. The evidence does not explain the necessity or the reason of listing the goods by the stamps, or why the description of the stamps was material. If the goods were bought for him, he could take them as well with blurred stamps as Clayton, and his title would not be thereby affected. The inference that he did not intend to take them in the beginning, and that Clayton so understood it, is fairly deducible from all the facts. If Clayton was the owner of the goods, Epstein & Co. could not recover for their seizure and conversion. There was no error in this conclusion of the court.

We find no error in the judgment of the court below, and are of the opinion it should be affirmed.

*Affirmed.*